**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| THE DEMOCRATIC PARTY OF VIRGINIA, | ) ) ) |
| Plaintiffs, | ) |
| | )  Civil Action No.: 1:13-cv-01218-CMH-TRJ |
| v. | ) ) |
| VIRGINIA STATE BOARD OF ELECTIONS, et al., | ) ) ) |
| Defendants. | ) |

.

**MEMORANDUM IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION**

Defendants Virginia State Board of Elections, Charles Judd, Kimberly Bowers and

Donald Palmer in their capacities with the Virginia State Board of Elections, Robert F.

McDonnell in his capacity as Governor of Virginia and Kenneth T. Cuccinelli, II, in his capacity

as Attorney General of Virginia (collectively "Defendants") respectfully submit this brief and

accompanying declarations in opposition to plaintiff's motion for preliminary injunction.[1]

**INTRODUCTION**

Plaintiff seeks a mandatory preliminary injunction restoring over 38,000 ineligible voters

to Virginia's voter rolls.  This action and motion are based on a false premise - that the State

Board Elections ("SBE" or "State Board') directed a "purge" of voters and that there are "errors"

in the lists provided by SBE to the local election officials.  As can be seen in the declarations

submitted by Defendants, the voter registration list maintenance activities at issue herein are

---

[1] The injunction is sought against all of the defendants and therefore this opposition is filed on behalf of  all defendants.  However, it should be noted that the claims against the State Board of Elections as an entity, Governor McDonnell and Attorney General Cuccinelli are barred by sovereign immunity.  Moreover, plaintiff has not made one allegation of fact demonstrating the need for an injunction against the Governor or Attorney General.

lawful and routine and are being applied fairly to all voters.  The lists in question were reviewed and prepared carefully by SBE and were sent to the registrars for review and possible cancellation.  The so called "errors" were simply voters that should not be cancelled and - with one lone exception that has already been corrected - have not been cancelled.

In a bizarre twist, the plaintiff also complains that the Secretary of the State Board told the general registrars to use their "best judgment" in doing their statutory duty to review lists of individuals who registered in another state for possible cancellation.  This was not a standard-less or arbitrary direction: under Virginia law, the general registrars are responsible for voter registration list maintenance activities and reviewing lists like those at issue herein is one of their core functions.  The standard was clear: if a citizen registered to vote in another state after Virginia, that is a request to cancel their Virginia registration under the law.  Over 38,000 individuals did just this and were properly cancelled.  Over 18,000 Virginia citizens were reviewed and left on Virginia registration rolls.  In short, the system worked and there is no basis to restore 38,000 out of state voters to Virginia's voter registration lists.

Because the plaintiff cannot satisfy the elevated standard that applies to a mandatory preliminary injunction, the extraordinary relief of a preliminary injunction should be denied.

## STATEMENT OF FACTS

### 1.    SBE's Core Function Includes Voter Registration List Maintenance

One of the key responsibilities of SBE is to ensure the integrity of elections in the Commonwealth.  Palmer Dec. ¶ 4; Judd Dec. ¶ 3; Davis Dec. ¶ 2.  A core function to meet that responsibility is maintaining and improving Virginia's voter registration system.  To improve Virginia's voter rolls, SBE has sought to both increase voter registrations among eligible citizens and cancel the registrations of those ineligible to vote.  Palmer Dec. ¶ 4.

The database used for Virginia voter registration is called the Virginia Election and Registration Information System ("VERIS").  Davis Dec. ¶ 2.  VERIS is used by all 133 electoral jurisdictions in the Commonwealth to maintain the voter registration list for all registered voters in Virginia.  *Id.* at ¶ 3.  VERIS contains the voter registration information of over 5.2 million registered voters in Virginia and has been in use since February 2007.  *Id.*  Access to VERIS is controlled by SBE and the infrastructure and software development and maintenance services for VERIS are provided and/or coordinated by SBE.  *Id.*  In accordance to the Code of Virginia, each registered voter provides personally identifying information to their respective general registrar on a form provided by SBE.  *Id.* at ¶ 4.  That information is then transcribed into VERIS by the general registrar or by members of their staff. *Id.*

Voter registration list maintenance is an ongoing and important function of SBE . Judd Dec. ¶ 3. For example, SBE obtains a monthly list of felons from the Virginia State Police. Davis Dec. ¶ 5.  The felon data is pulled into VERIS and compared to the voters who are currently registered.  *Id.*  When a potential match is identified, SBE alerts the impacted general registrar of the potential match and the general registrar makes the final determination on whether or not the felon record belongs to the identified registered voter.  *Id.*  If there is a match, the general registrar's duty is to cancel the voter's registration record and send the cancelled individual a letter informing him of the action.  *Id.*

SBE performs similar processes on a monthly basis with data obtained from the Social Security Administration, federal and state courts, the Virginia Department of Health Bureau of Vital Statistics and the Department of Motor Vehicles.  Davis Dec. ¶ 6.  In each of these cases, SBE identifies potential voter registration records that have an issue for the general registrars, such as death of the voter or incompetency.  *Id.*  The general registrars' statutory duty is to

3

review the evidence provided to them and make registration decisions in accordance with the

Code of Virginia.  *Id.*

Likewise, SBE annually compares the entire voter registration list with the United States

Postal Service's Change of Address database.  Davis Dec. ¶ 7.  On average, this process results

in SBE mailing out 250,000 notices to voters requesting that they confirm their registration

address.  *Id.*  Voters who do not respond to this mailing are moved to an inactive registration

status.  *Id.*  Voters who do respond or who have moved within their current registered locality

have their voter registration records updated by their respective general registrar.  *Id.*

**2.     The Elimination of Duplicate Registrations In Multiple States Is Necessary To Maintain Accurate Voter Registration Records**

Focusing specifically on dual registrations -- where a citizen is registered in more than

one state -- the necessity for eliminating such duplicate voter registrations is well documented.

Palmer Dec. ¶¶ 5-10.  There were two major bi-partisan or non-partisan studies that demonstrate

the need for eliminating duplicate registrations for voters that have moved to another state.  *Id.*

Virginia has taken great strides to enhance voter registration, including mailings to unregistered

eligible citizens and the implementation of online registration as discussed below.  *Id. at ¶* 11.

In 2007, bipartisan legislation sponsored by Virginia House of Delegates member Bob

Brink (D-Arlington) passed the General Assembly unanimously and included a provision

authorizing SBE to share data with other state voting officials for the purpose of list

maintenance.  Chapter 318 Acts of Assembly (2007).  Palmer Dec. ¶ 12.  Additional legislation

passed in 2011 and 2013 expanded SBE's mandate to share this registration data with other

states and specifically to take steps to prevent the duplication of registrations in more than one

state or jurisdiction.  *See* Va. Code §§ 24.2-404(A)(10) and 24.2-404.4;  *Id.*

4

Virginia's legislatively mandated process for providing for cancellation of a Virginia registration following official communication of registration in another state, coupled with subsequent legislation improving official communication between states, are all vital to protecting voters, candidates and the integrity of elections and increasing voter confidence in the registration and electoral process.  Palmer Dec. ¶ 13.

As a result of the bipartisan changes to the Code of Virginia, SBE began implementing data-sharing with other states.  To that end, SBE has joined two different consortiums of states for the purposes of sharing voter registration data to improve the accuracy of our voter registration list.  Palmer Dec. ¶ 15.

The first project to yield any results for SBE was the Electronic Registration Information Center ("ERIC").  The ERIC project is discussed in detail in the Palmer Dec. at ¶ 16.  In summary, the ERIC project consists of seven states including Virginia and uses both the Virginia Department of Motor Vehicle ("DMV") data as well as SBE voter registration data to identify possible dual registrations as well as to identify individuals who are not registered to vote but who are likely Virginia residents.  *Id.*  Through the data developed by the ERIC project, SBE mailed 867,852 postcards to unregistered Virginia residents' mailing addresses on September 27, 2012.  *Id.*

Other efforts to enhance voter registration include an online voter registration portal that allows voters to register and update their registration online with an appropriate DMV customer identification number.  Palmer Dec. ¶ 17.  This was just launched in July 2013 based upon legislation drafted and supported by SBE.  *Id.*  To further enhance voter registration, SBE has submitted a budget request for the next state budget that includes a cash investment to provide improved technology for voter registration and updates at the DMV office locations, allowing

for registration applications submitted at DMV to be sent electronically to SBE and the localities. *Id.* This reform will eliminate the current paper registration that inevitably leads to applications lost in the mail and errors by voters and local election staff in inputting data into the registration database. *Id.*

### 3.     Virginia Carefully Implements the Interstate Crosscheck Program

The second data-sharing project to get off the ground for SBE was the program that is at issue herein -- the Interstate Crosscheck Program ("Crosscheck"). Despite plaintiff's assertion that this is a Republican initiative, the Crosscheck process started in 2005 through a bipartisan effort by a number of Secretaries of State, including then-Kansas Secretary of State Ron Thornburg (R) and Secretary of State Robin Carnahan (D) from Missouri. Palmer Dec. ¶ 18. In each election, the number of states participating in the program has increased. *Id.* By 2013, a total of 22 states participated in the program sharing over 84 million voter registration records. *Id.* Twenty-six states are members today. *Id.*

In January 2013, each participating state submitted their entire list of registered voters, including the voter's date of birth, last four digits of their Social Security Number (where allowed by law), current registration address, whether or not they had voted in the November 2012 General Election, and applicable dates of registration activity by the voter. Palmer Dec. ¶ 19.

In February and early March of 2013, SBE received the results from the Crosscheck match. Palmer Dec. ¶ 20. The preliminary results received from the Crosscheck data revealed the likelihood that as many as 308,000 individuals were registered in Virginia and another state as follows:  2 voters were found to be registered in 7 different states; 10 voters were found to be registered in 6 different states; 113 voters were found to be registered in 5 different states; 1,123

voters were found to be registered in 4 different states; 16,361 voters were found to be

registered in 3 different states; and 253,786 voters were registered in Virginia and one other

state.  Palmer Dec. ¶ 20; Davis Dec. ¶ 8.  The Crosscheck data also identified 296 voters who

appear to have voted in Virginia and another state in the November 2012 General Election.[2]

Davis Dec. ¶ 9.

After further review of the data in April 2013, SBE staff presented to the State Board[3] an

initial review of the Crosscheck findings.   Palmer Dec. ¶ 21; Davis Dec ¶ 10; Judd Dec. ¶ 5. At

this Board meeting, additional information was provided to the Board indicating potential

double-voting in Virginia and another state during the November 2012 General Election.  *Id.*

At that meeting, the State Board voted unanimously to ask the Office of the Attorney General to

investigate the possibility of voter fraud and double voting as a result of the Crosscheck.  *Id.*

and Exhibit 2 thereto; *See* Va. Code § 24.2-104.  Following the Board meeting, SBE sent an

email to all of Virginia's general registrars and electoral board members explaining to them the

Crosscheck and ERIC programs with a note to expect information on upcoming list

maintenance efforts as a result of the Crosscheck and ERIC data.  Palmer Dec. ¶ 21 and Exhibit

3 thereto.

In July 2013, as required by the Code of Virginia, SBE conducted Annual Training for all

general registrars and electoral board members and kicked off its annual federally required

National Change of Address mailing to approximately 250,000 voters.  Palmer Dec. ¶ 22.  SBE

---

[2] These cases are in various stages of investigation and/or prosecution.  Davis Dec. ¶ 11.  Nationally, the Crosscheck identified some 5 million records that were questionable in those 22 states and identified thousands who appear to have voted in multiple states.  The ERIC project made up of mostly additional states, including Virginia, identified hundreds of thousands of other registrations that needed updating.

[3] The State Board of Elections is both the supervisory board and the agency that handles the day-to-day administration of the work of SB.  *See* Va. Code §§ 24.2.-102 and 103.

provided guidance to registrars on the Crosscheck and other list maintenance activities at the training, during weekly calls with leadership of the local election officials and other venues. *Id.*

The Crosscheck process is part of an overall mechanism to provide out of state registration information to registrars (which is similar to what happens with deceased voters or felons as described above). Palmer Dec. ¶ 24. Thus, SBE regularly provides general registrars with official reports of registration in other states under Va. Code § 24.2-427(B)(iv). Since 2007, Va. Code § 24.2-427(B)(iv) has required general registrars to cancel voter registration based on official reports of registration in another state; the official report of registration in another state is treated as equivalent to a voluntary request for cancellation protecting the voter from duplicate registration, a felony under Va. Code § 24.2-1004. *Id.*

To implement the Crosscheck program, SBE staff worked on verifying data and eventually worked the larger list of over 308,000 potential matches down to approximately 57,000 Virginia registered voters registered in other states. Palmer Dec. ¶ 25. The Secretary of SBE stressed to both the Board and staff that Virginia's first attempt to work with the data be based upon full data matches, thus eliminating from consideration states with large potential matching populations like Florida, that do not use the Social Security Number for voter registration. Palmer Dec. ¶ 25; Davis Dec. ¶ 9.

Thus, all voters identified in the Crosscheck lists were matched based on a 100% exact match of first name, last name, date of birth and last four digits of their Social Security Number. Palmer Dec. ¶ 26. All of these fields had to be the same in their Virginia data and in the other state's data to be included on the list. *Id.* Additional data elements available to the local registrar while conducting their independent review that are in VERIS include each voter's full Virginia registration as well as their voting and correspondence history. *Id.*

8

With the narrowed down list of over 57,000 duplicate[4] registrations, implementation at the local level of the Crosscheck began on August 23, 2013, when each general registrar in Virginia was provided with an Excel spreadsheet listing the voters in their localities who were registered in another state. Davis Dec. ¶ 14 and Exhibit 1 thereto. The spreadsheet given to registrars included the Virginia voter identification number, the voter's name, date of birth, last 4 digits of their Social Security Number, the other state and jurisdiction where they were registered, their current Virginia registration status and the dates of registration in both Virginia and the other state. *Id.* The general registrars were asked to review the records for possible cancellation. *Id.* They were not instructed to cancel every voter on the list. SBE made clear that the records were to be handled in the same manner as other out of state cancellation notices that the general registrars may receive, in accordance with state laws and regulations. *Id.* General registrars were instructed to accomplish a final round of quality checks at the local level before any official action was to be taken to cancel a registration record. *Id.*

**4.    The Crosscheck Lists Were Accurate**

These lists were extremely accurate and are not "riddled with errors." Plaintiffs Br. at 7. Any so called "errors" were to be expected. Davis Dec. ¶ 16. First, SBE does not cancel voters' registrations based upon the Crosscheck list or similar lists. Palmer Dec. ¶ 28; Davis Dec. ¶ 16. Instead, these lists are sent to the general registrars whose duty it is to review all of the available data within VERIS regarding each voter registration record. *Id.* For example, the general registrar would have checked the vote history for each voter to see if they have actively participated in elections since registering in the other state and they would have checked the

---

[4] For ease of discussion, Defendants refer to the multiple registrations as "duplicate." However, as set forth in the Davis Dec. at ¶ 16 and above, the original list of over 308,000 multiple registrations showed voters registered in as many as 7 different states and over 16,000 voters registered in 3.

correspondence records to see if the voter had responded to a letter requesting information since registering in the other state. *Id.*

There appear to be two primary reasons why there are so called "errors" in the Crosscheck list. Davis Dec. ¶ 17. First, a voter can move out of state, register in that state, then move back to Virginia and submit an application here. *Id.* If his registration in Virginia was never cancelled, registrars treated the new application as a voter registration update. *Id.* This type of voter would still show up on the Crosscheck list as having a voter registration date that pre-dates the out of state registration. *Id.* The registrar would quickly identify this during his review and not cancel such a voter. *Id.*

Second, the Crosscheck list is based on data at a specific point in time. Davis Dec. ¶ 18. In other words, the Crosscheck list accurately reflects the data as of January 2013. *Id.* This is when all of the data was provided to the coordinator of the Crosscheck. *Id.* The final Crosscheck list was not provided to the election community until August 2013. *Id.* During this intervening time, a voter could have registered in Virginia or voted in a primary. *Id.* Thus, the voter would show on the Crosscheck list as a possible cancellation but in fact would not be eligible for cancellation, and the registrar would be able to quickly determine that with the information provided. *Id.*

Based on feedback received from general registrars, on August 28, SBE updated the Excel spreadsheets provided to the localities to include new columns of data. Davis Dec. ¶ 15 and Exhibit 2 thereto. SBE  added the voter's address in the other state and added a column that showed the date of the last registration application received in Virginia. *Id.* SBE also made clear that the general registrars should not cancel any voter who had a more recent Virginia activity date than the date of registration in the other state. *Id.*

All potential duplicate registrations identified in the Crosscheck are acted on only at the local level.  Palmer Dec. ¶ 27.  Each of these voters information was sent to the general registrar for independent evaluation of the voter record, which is a duty of the general registrar under Va. Code §§ 24.2-114(12) and 24.2-404(A)(4).  *Id.*  Each voter's record examined by the registrar would include voting history subsequent to the reported registration in another state as well as subsequent registration in Virginia.  *Id.* at ¶ 28.  If a registrar's independent review of a voter record raises any question or concern, the correct practice would be for the registrar to make an inquiry of the voter.  *Id.* at ¶ 29.

The registrar's careful independent review could result in several alternative dispositions short of cancellation, including no action at all, sending the voter a letter asking if he still wants to be registered in Virginia, and if that mailing is returned undeliverable, noting the voter's records for inclusion in the annual address confirmation process set forth in Va. Code §§ 24.2-428 through 24.2-428.2.  Palmer Dec. ¶ 30.

Any voter whose registration the registrar determines to cancel after careful independent review of the voter's record is individually mailed a notice of cancellation inviting him to reapply if eligible.  Palmer Dec. ¶ 31 and Exhibit 5 thereto.  The cancellation notice is mailed often to both the last known Virginia registration address of record and to the new state registration address reported to Virginia.  *Id.* at ¶ 32.  Sending the cancellation notice to the out of state address is done to provide actual notice to voters who have already failed to respond to an official request to confirm their Virginia residence address under Virginia's separate annual address confirmation procedure set forth in Va. Code §§ 24.2-428 through 24.2-428.2.  *Id.*

Some voters reported as registered in other states may have returned to reside in Virginia at a new address without informing the registrar as required by Va. Code § 24.2-424.  Palmer

Dec. ¶ 33.  To assure these voters an opportunity to update address information before books close for the November election,  SBE guidance recommended completing action on the Crosscheck lists by October 1, 2013, to allow any affected individual the opportunity to respond to notice of cancellation before the October 15, 2013 registration deadline and for registrars to make necessary preparations for the November General Election.  *Id.*

To be sure that implementation of the Crosscheck was being done legally and uniformly throughout the Commonwealth, Secretary Palmer sent a September 3 guidance email and also had SBE prepare and send to the entire election community a Frequently Asked Questions ("FAQ") document on September 24.  Palmer Dec. ¶ 34 and Exhibit 6 thereto.  Both the guidance email and the FAQ document summarized and formalized much of the advice that staff have been providing to registrars on an individual basis in between the August emails and late September.  *Id.*  In addition to their statutory responsibilities, the FAQ document guided the registrars in how to process the Crosscheck reports and also importantly how to handle affected voters who might appear to vote to assure that no eligible voter was disenfranchised on account of error.  *Id.*

## 5.     The Results of the Crosscheck Demonstrate Its Accuracy and There Are Important Safeguards to Remedy Any Error

A summary of the results of the Crosscheck demonstrate both its effectiveness and the accuracy in which it was implemented.  Palmer Dec. ¶ 36.  After narrowing down the Crosscheck list from over 308,000 to 80,000 and then to 57,923 (the actual number sent to the field), the following is the current status of those 57,923 individuals:  (1) 38,870 were cancelled based upon registration in another state after Virginia; (2) 11,138 were left on the Virginia rolls and are still active voters; and (3) 7,285 were left on the Virginia rolls although they remain inactive.  *Id.*  This is a statewide cancellation rate of 78 percent.  *Id.*

In the event that someone was removed from the voter rolls in error, there are important procedures that will protect that voter's rights.  Palmer Dec. ¶ 37.  Virginia's provisional ballot procedures provide a further safeguard protecting against official error in the Crosscheck review process.  *Id.* and *see* Exhibit 6 thereto, question 10.  In the unlikely event that a qualified voter was removed from the voter registration list, they would vote by provisional ballot.  *Id.*  That provisional ballot should be counted at the canvass the day after Election Day once the electoral board determines that the voter is eligible to vote for that election.  *Id.* Moreover, SBE guidance expressly directs that even after the close of books, to correct official error, a registration cancelled in error may be reinstated.  *Id.*  In other words, if a voter should not have been cancelled, they do not have to vote by provisional ballot (which is a fail-safe), but can contact their registrar and will be reinstated.

Another important safeguard in the Code of Virginia is a voter's right to an administrative appeal before the registrar.  Va. Code § 24.2-429.  Palmer Dec. ¶ 38.  If unsatisfied with the result before the registrar, the voter can further appeal the registrar's ruling to Circuit Court.  Va. Code § 24.2-430.  *Id.*  Despite the cancellation of over 38,000 voter registrations, SBE is unaware of any case in which a disputed report of registration in another state required a hearing before a registrar or judicial correction. *Id.*

These same safeguards - provisional voting and appeals - often protect voters' rights when cancelled through error based upon things other than out of state registration.  Palmer Dec. ¶ 39.  As stated above, SBE produces a list of deceased voters based upon data provided by the Social Security Administration.  *Id.*  Sometimes, a voter is wrongfully cancelled as deceased.  *Id.*  When that voter shows up to vote, his vote is counted and his registration is restored.  *Id.*  Based upon those fairly rare errors, however, SBE is not going to halt processing

of death records --and should not be ordered to halt the processing of the cancellations at issue in this case.  *Id.*

Voters typically call SBE to seek guidance and to complain when they deem necessary about actions by the election community.  Palmer Dec. ¶ 40.   SBE staff was asked to notify the Secretary of SBE of any complaints concerning implementation of the Crosscheck.  *Id.*  SBE is not aware of one phone call from a voter who claimed to have been inaccurately cancelled by the Crosscheck.  *Id.*

**6.     A Geographically Diverse Group of Registrars Completely Support The Crosscheck and Were Able To Implement It Without Any Issues**

Plaintiff provides virtually no evidence to support its motion.  It presents affidavits from employees of the plaintiff purportedly repeating what registrars said, but the vast majority of those statements do not conflict with SBE's view of the case.  Those declarations from plaintiff's employees show that the Crosscheck lists did in fact have some names on them that should not have been cancelled, and in fact were not cancelled after the registrars completed their work with the lists.

Plaintiff proffers the affidavit of one general registrar, Larry Haake, III.  Mr. Haake points out that half of his Crosscheck list voters were inactive voters as if that were somehow problematic, but that would be expected with a list of voters that should be reviewed for cancellation (inactive voters have already not responded to at least one mailing after notice from postal service authorities of a move and sometimes two mailings, or one undeliverable piece of election mail and subsequent confirmation mailing).  Palmer Dec. ¶ 43.  Mr. Haake then in effect states that because he believed that 17% of his list should have remained on the rolls, that he decided unilaterally to keep 83% on the rolls that clearly should be cancelled.  *Id.*  This is in violation of his duties under the Code that require him to complete his action no later than 30

14

days after receipt of the Crosscheck (or other) list from SBE. Va. Code § 24.2-404(4). *Id.* He is the only registrar in the Commonwealth that refused to perform his duty of carefully checking the individuals on the lists. As Secretary Palmer has made clear, he expected Mr. Haake and all of the registrars to review their lists and only cancel those registrations that should have been cancelled. *Id.*

With regard to the other statements attributed to various registrars, SBE never told the Chesapeake Registrar to strike the names on the Crosscheck list. Contrast the Declaration of Matthew Weinstein (par. 11) and Nicholas Brana (par. 2) with the Declaration of the Chesapeake Deputy Registrar Mary-Lynn Pinkerman. Ms. Pinkerman specifically states that:

> Contrary to what is stated in the Weinstein and Brana Declarations, the State Board of Elections did not say the list of voters given to Chesapeake as part of the Interstate Voter Crosscheck "should be stricken" from the voter registration lists. Instead, as stated by Mr. Spradlin, I understood that the data on the list was to be carefully checked prior to the cancellation of any voters' registration. Pinkerman Dec. ¶ 2.

Other statements in the plaintiffs' declarations show the registrars are doing their duty -- checking the names against voter records and other available data. With regard to the few registrars that reportedly stated they had cancelled all the voters on their lists, SBE has followed up with those registrars and we are satisfied that correct procedures were followed. Palmer Dec. ¶ 44.

Contrast the plaintiff's lone declaration from a registrar and the statements by their employees with the declarations submitted herewith. SBE has proffered the declarations of:

- Richard J. (Jake) Washburne, General Registrar of Albemarle County;

- William A. Spradlin, General Registrar of Chesapeake City;

- Mary-Lynn Pinkerman, Deputy Registrar of Chesapeake City;

- Teresa F. Smithson, General Registrar of Hanover County;

- Alexander Ables, General Registrar of Fauquier County;

- Tom Parkins, General Registrar of the City of Alexandra;

- Cameron P. Quinn, General Registrar of Fairfax County;

- Greg S. Riddlemoser, General Registrar of Stafford County;  and

- J. Kirk Showalter, General Registrar of the City of Richmond.

Consistent through most, if not all, of the declarations by these election officials are statements that:

1. The Crosscheck is a welcome tool that has long been requested;

2. They regularly handle out of state cancellation notices and are well versed in the law and guidelines in how to handle such notifications;

3. SBE instructions were clear that it was the registrars responsibility to determine if a registration should be cancelled based upon a careful review;

4. They were able to complete their review in a timely fashion and understood the correct way to review a registration record;

5. Notice was sent to all individuals that were cancelled;

6. Any actions in error or questioned by voters were promptly addressed and corrected if warranted.

These declarations from election officials demonstrate that the Crosscheck is being carried out correctly and fairly.  There is no evidence that the Crosscheck list is based upon any discriminatory factor or targets any type of voter.  *See* Judd Dec. ¶ 6.  The over 38,000 individuals - who despite plaintiff's assertion to the contrary are no longer citizens of the Commonwealth - moved out of state and registered where they now live.  They have been correctly removed from the voter rolls.  The remaining individuals on the lists - who are in fact

citizens of Virginia and should remain on the rolls - are still where they belong, on the rolls of

the Commonwealth's voters.  The few errors identified by plaintiff and the recalcitrance of one

general registrar who is in fact out of compliance with the law, provides no basis to provide a

Virginia voter registration to over 38,000 clearly ineligible individuals.  Accordingly, the

motion for a preliminary injunction should be denied.

## ARGUMENT

### I.        The Standard For Mandatory Preliminary Injunctive Relief

Preliminary injunctive relief, "an extraordinary remedy never available as of right," may

be had only when the plaintiff makes a "clear showing" "that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

*NRDC, Inc.*, 555 U.S. 7, 20, 22, 24 (2008) *accord Monsanto Co. v. Geertson Seed Farms*, 130 S.

Ct. 2743, 2756, 2761 (2010) (reversing an award of injunctive relief as an abuse of discretion);

*Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).  All four factors must be

shown.  *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated by*

130 S. Ct. 2371 (2010), *reinstated in pertinent part by* 607 F.3d 355 (4th Cir. 2010); *see*

*Monsanto*, 130 S. Ct. at 2757 ("An injunction should issue only if the traditional four-factor test

is satisfied.")

In the instant case, the first part of this test is even harder to meet than the traditional

likelihood of success.  That is because here plaintiff seeks to not only preserve the status quo, but

also seeks to require the SBE to restore the voting eligibility of over 38,000 individuals who

have been removed from the rolls by the general registrars.[5]  Plaintiff's Br. at 2, 4.  Plaintiff's

request for "[m]andatory preliminary injunctive relief" is "disfavored," and the "exacting

standard of review [for preliminary injunctive relief is] even more searching."  *In re Microsoft*

*Corp. Antitrust Litig.*, 333 F.3d 517, 525-26 (4th Cir. 2003) ("[A] mandatory preliminary

injunction must be necessary both to protect against irreparable harm in a deteriorating

circumstance created by the defendant and to preserve the court's ability to enter ultimate relief

on the merits of the same kind."); *accord Perry v. Judd*, 840 F. Supp. 2d 945 (E.D. Va. 2012)

(applying this heightened standard of review to a request for preliminary mandatory injunctive

relief against the Virginia residency requirement for petition circulators).  To carry its burden of

persuasion, the plaintiff thus must establish that "the legal rights at issue are 'indisputably clear.'"

*See In re Microsoft*, 333 F.3d at 525 (citing *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235

(1972) (Rehnquist, J. in chambers) for the proposition that "the applicants' right to relief must be

indisputably clear" to obtain preliminary mandatory injunctive relief).  On the factual record

presented herein, the plaintiff cannot carry this heavy burden.

## II.   The Request For Preliminary Injunction Fails To Meet The Necessary Requirements

### a.   Plaintiff's Right To Relief Is Not Indisputably Clear

#### 1.   The Plaintiff Cannot Show A Violation Of The Equal Protection Clause

When reviewing the validity of a State's election regulation under the Equal Protection

Clause, the Fourth Circuit has recognized a meaningful distinction between those regulations

which establish voter qualifications, and those which simply place a burden on voters' ability to

cast a vote.  *Greidinger v. Davis*, 988 F.2d 1344, 1349-50 (4th Cir. 1993).  Laws which deny

---

[5] It should be noted that SBE is not the appropriate party that would reinstate voters to the rolls.  SBE did not remove those voters, and has no authority in this instance to add individual voters to the registration records.

voter registration on a discriminatory basis are subject to strict scrutiny review, and to maintain

such laws a State must demonstrate that a compelling state interest necessitates the regulation.

*Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  However, "the Court has distinguished between

provisions that result in 'an absolute denial of the franchise' and provisions that made 'casting

the ballot easier for some.'"  *Greidinger*, 988 F.2d at 1350.  As a result, where individuals are

not absolutely denied the franchise, such as cases involving the denial of absentee ballots to

certain classes of voters, regulations are not subjected to strict scrutiny.  *See e.g. McDonald v.

Bd. of Election Comm'rs of Chicago*, 394 U.S. 802 (1969), *Griffin v. Roupas*, 385 F.3d 1128 (7th

Cir. 2004).

More specifically, in the context of Equal Protection challenges to voter list maintenance

laws, courts have recognized a state's right to perform regular maintenance of lists of registered

voters, especially in light of the interest in preventing voter fraud:

> It is well established that purge statutes are a legitimate means by which the State can
> attempt to prevent voter fraud. More importantly registered voters are purged -0without
> regard to race, color, creed, gender, sexual orientation, political belief, or socioeconomic
> status –because they do not vote, and do not take the opportunity of voting in the next
> election or requesting reinstatement.

*Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Division*, 28 F.3d

306, 314 (3d Cir. 1994) (citing *Hoffman v. Maryland*, 928 F.2d 646, 649 (4th Cir. 1991); *Rosario

v. Rockefeller*, 410 U.S. 752, 761 (1973); *Barilla v. Ervin*, 886 F.2d 1514, 1523-24 (9th Cir.

1989).  The *Ortiz* court continued to find that "the procedures for re-registering to vote are

identical to those for registering in the first place; therefore, they are not more complicated,

burdensome, or discriminatory than the requirement of initial registration." *Ortiz*, 28 F.3d at 314

(citing *Williams v. Osser*, 350 F. Supp. 646, 653 (E.D. Pa. 1972)).  In light of this discussion of

the overall permissibility of voter list maintenance as a legitimate, and valuable, state interest in

preventing voter fraud, it is clear that Virginia's implementation of the Crosscheck does not impermissibly impinge on voters' rights.  This is especially true as the Commonwealth provides multiple options for individuals on the list who wish to avoid removal.

In *Hoffman v. Maryland*, the Fourth Circuit emphasized that failure to remove inactive voters could lead to fraudulent voting by imposters, such that "keeping accurate, reliable and up-to-date voter registration lists is an important state interest."  *Hoffman,* 928 F.2d at 649.  The court also acknowledged that while re-registration could be burdensome to voters, but found that this burden was outweighed by the importance of the state interest at stake here, and concluded that "it is a small price to pay for the prevention of vote fraud."  *Id.* (citing *Rosario*, 410 U.S. at 761).  In *Hoffman*, as in the present case, while voters may be required to take action to prevent their removal from the voter lists, the state interest in protecting the integrity of elections justifies the imposition of this burden.

The Supreme Court of the United States has found that voters who fail to act to preserve their franchise right, and subsequently find themselves ineligible to vote, cannot constitute an aggrieved class for the purpose of bringing allegations of discriminatory election legislation. *Rosario* 410 U.S. 752.  In this case, the Court stated that the failure to take a step which will preserve a voter's right to vote in a particular election does not constitute discriminatory action on the part of the state. *Id.* at 758 ("[i]f their plight can be characterized as disenfranchisement, it was not caused by § 186, but by their own failure to take timely steps to effect their enrollment.") In *Rosario*, the challenged law "did not constitute a ban on their freedom of association, but merely a time limitation on which they had to act in order to participate in their chosen party's next primary." *Id.*  Accordingly, this statute "did not absolutely disenfranchise the class to which the petitioners belong." *Id.* at 757 (describing this class as "newly registered voters who were

eligible to enroll in a party before the previous general election.").  Instead, the Court found the contrary to be true—namely that this law was a reasonable means by which the state government chose to preserve the integrity of its primary system. *Id.* at 761.  ( "[i]t is clear that the preservation of the integrity of the electoral process is a legitimate and valid state goal," and that "New York does not prohibit the petitioners from voting in the 1972 primary election or from associating with the political party of their choice.  It merely imposed a legitimate time limitation on their enrollment, which they chose to disregard.")  Where a regulation, such as this New York statute, represents a reasonable State approach that addresses a legitimate concern, and where a voter can preserve his right to vote by following the delineated procedure, any failure to do so does not give rise to a challenge against the regulation on the basis of any alleged discriminatory impact.

On the facts presented herein, there is not even a hint of an equal protection violation, let alone a showing of an indisputably clear violation as necessary for the mandatory injunction sought herein.  First, an individual does not have a right to vote where he does not reside.  The over 38,000 individuals removed from the Virginia voter rolls have registered in another state.  They were thus correctly cancelled under the law.  This is quite different from what was presented in *Bush v. Gore* where there were arbitrary and differing standards being applied to whether to count a particular vote.  Second, the few errors where a voter was removed from the rolls and should have remained on the rolls have already been corrected.  As the case law above demonstrates, making those voters respond to a cancellation notice does not create an equal protection violation.  Third, the fact that one registrar has refused to do his statutory duty does not create an equal protection violation.  All of the individuals are being treated equally under the law.  The fact that one registrar is wrongly applying the law -- leaving on the rolls ineligible

voters -- does not change this result.  His failure to act does not give other individuals who are plainly ineligible the right to vote where they do not reside.  Lastly and perhaps most importantly, the evidence (most of which is hearsay) submitted by plaintiff holds virtually no weight against the detailed and substantial first-hand accounts submitted in opposition to this motion.  SBE has demonstrated that not only is it not part of some "scheme" to eliminate eligible voters from the rolls, but instead is in fact working hard to expand the franchise to eligible voters through mailings and electronic voter registration.  While hearsay may be *permissible* in a motion for a preliminary injunction, the Court can certainly take into account the weight it should be given, particularly when contrasted against the defendants' declarations.[6]

Plaintiff makes much of the fact that the Secretary of SBE asked the registrars to use their "best judgment."  However, Secretary Palmer has made clear that when he asked the registrars to use "their best judgment," that was not meant to imply (nor does he think any registrar understood it that way) that registrars should not apply well accepted standards to possible cancellations.  In fact, the declarations of the local registrars before this Court demonstrate that they clearly understood how to perform the Crosscheck.  The standards by which they reviewed the Crosscheck lists are set forth in the Code and in the guidance given over many years by SBE on how to treat cancelations based upon relocation to another state.  Secretary Palmer stated that he has confidence in the registrars that they would use their best judgment to review each voter and cancel only those registrations that should be cancelled.

This is not the standard-less "intent of voter" test that the Court in *Bush v. Gore* struck down.  This is in fact very straightforward.  If an individual registered in Virginia after the other

---

[6] The Court should place particular emphasis on the directly conflicting statements of Mathew Weinstein and Nicholas Brana stating as hearsay what Ms. Pinkerman of Chesapeake City allegedly said.  Ms. Pinkerman has put a declaration before this Court that directly refutes that hearsay.  The additional hearsay submitted by plaintiff should be discounted because of these misstatements.

state, they are not to be cancelled.  If they registered in another state after Virginia, they are

cancelled.  If there is any doubt regarding this based upon their voter history, they are to be

further investigated before a registrar takes action.  And by referring to the results of the

Crosscheck, it is plain that this is in effect what has occurred.  Accordingly, the plaintiff has not

met the heavy burden of showing an indisputably clear equal protection violation and the motion

for a preliminary injunction should be denied.

### 2.  The Plaintiff Cannot Show A Violation Of The Due Process  Clause

Plaintiff's argument related to Due Process is that because voters are subjected to

disparate treatment, plaintiff's members and supporters are being denied the right to vote in

violation of due process.  Plaintiff's Br. at 17.  On the facts presented herein, this argument

makes no sense.  Not one eligible voter is before this Court saying he was denied the franchise or

is in danger of losing his right to vote.  This preliminary injunction seeks the restoration to the

voting rolls of over 38,000 individuals that moved out of state.  Every one of these individuals

was required by law to receive a notice of cancellation.  As set forth in the Palmer Dec., each of

these individuals had multiple opportunities to object and obtain a hearing before a registrar and

then before a Circuit Court.  Even if all else fails, if they are able to show they were cancelled in

error - in other words, they still live in the Commonwealth and are a qualified voter - their vote

will count.  The remaining over 18,000 qualified voters that are still on the rolls from the

Crosscheck have not suffered at all.  This is the opposite of a due process violation.  The cases

cited herein make clear that voter registration list maintenance activities do not constitute a

violation of due process.  Accordingly, the plaintiff has not shown an indisputably clear violation

of the due process clause.

### b.  Plaintiff has not established that it will suffer irreparable harm if the requested relief is denied

Plaintiff alleges that its members will suffer irreparable harm absent injunctive relief based on "ample evidence" that lawfully registered are being denied their constitutional right to vote.  Plaintiff's Br. at 18.  Contrary to this claim, Plaintiff has not provided evidence of even one qualified voter who has been deprived of the right to vote.  The Crosscheck should not disenfranchise a single Virginia voter and there has been no harm caused by the Crosscheck. As set forth herein, the Crosscheck has served an important governmental purpose in cleaning up the Virginia registration rolls by eliminating from the rolls over 38,000 individuals who clearly registered in another state after registering in Virginia.

There are more than adequate remedies available to the plaintiff and the individuals it purports to represent.  First, any voter that was wrongfully removed has already been restored to the rolls to the best of SBE's knowledge.  Even if a voter shows up on election day and had been removed, they will be permitted to cast a provisional ballot, and that ballot will count if they are qualified to vote.

Plaintiff denigrates provisional balloting as a process, but provisional ballots are legitimate means of voting and in no way diminishes a citizen's right to vote.  Thus, the Supreme Court has recognized that the casting of a provisional ballot is an adequate remedy for problems involving voter identification.  Recently upholding Indiana's photo-identification requirement, the Court held:

> A photo identification requirement imposes some burdens on voters that other methods of identification do not share. For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard. Burdens of that sort arising from life's vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality of SEA 483; the *availability of the right to cast a provisional ballot provides an adequate remedy for problems of that character*.

*Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197-198 (2008) (emphasis added).

The plaintiff further contends that being stripped of a constitutional right is a per-se irreparable injury.  Not only does this claim ignore the fact that no constitutional right has been, or will be, denied in this case, it is an inaccurate application of the cited authority, all of which deal with the loss of First Amendment rights.  *See Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury.") (citing *Elrod v. Burns*, 427 U.S. 347, 373(1976)); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (Internal citation omitted); *Déjà vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377,400 (6th Cir. 2001) ("This is because the Supreme Court has recognized that even minimal infringement upon First Amendment values constitutes irreparable injury.")(Internal citation omitted).

### c.   Defendants Will Suffer Significant Harm If The Injunction Is Granted.

The balancing of the equities also weighs against an injunction.  As discussed herein, the Commonwealth has a compelling governmental interest in maintaining its voter registration rolls. If an injunction issues, over 38,000 unqualified voters will be returned to the rolls and allowed to cast a vote in Virginia, while at the same time they are registered to vote in another state.  This is far from maintaining the status quo and does harm to Virginia citizens.  Requiring over 38,000 individuals to be restored to the voting rolls when they are clearly ineligible to vote because they have registered in another state would be disruptive of the upcoming election and will unnecessarily burden the election community.  Palmer Dec. ¶ 48.  The Crosscheck should not disenfranchise a single Virginia voter and thus there has been no harm caused by the Crosscheck. The very few voters cancelled by mistake have contacted registrars and been restored.  Should

any show up on election day who were wrongfully cancelled, they will be permitted to vote provisionally and their vote should be counted.  Palmer Dec. ¶ 37.

### d. Defendants' Continued Maintenance Of The Accuracy Of Its Voter Registration Rolls Serves The Public Interest.

"A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989).  In this case, the state has a compelling interest in maintaining the voter registration rolls and ensuring that individuals who are registered to vote in Virginia are not also registered to vote in another state.  "Countering the State's compelling interest in preventing voter fraud is the strong interest in all qualified voters exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (Citing *Dunn* v. *Blumstein*, 405 U.S. 330, 336 (1972) (internal quotation marks omitted).

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell*, 549 U.S. at 4, (citing *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964). Thus, protecting the right of qualified citizens to vote necessarily requires preventing non-citizens from voting. Requiring the Commonwealth to return over 38,000 clearly unqualified voters to the voter registration rolls is antithetical to the public interest.

### CONCLUSION

Because plaintiff's claim of likelihood of success cannot withstand the more searching and exacting standard of review applicable to motions for preliminary mandatory injunctive relief, its motion should be denied.  The State Board of Elections has demonstrated with credible and first-hand evidence that its participation and implementation of the Crosscheck was proper and has not harmed any eligible voters.  Instead, the Crosscheck process removed from the voter

rolls over 38,000 individuals who have moved outside the Commonwealth.  Plaintiff has not

provided any facts nor law that would warrant placing those individuals back on the rolls of the

Commonwealth.  Accordingly, plaintiff's motion to enjoin defendants' ongoing maintenance of

its voter registration rolls should be denied.

Respectfully submitted,

Date: October 15, 2013                   /s/Joshua N. Lief
                                         Joshua N. Lief
                                         Senior Assistant Attorney General
                                         VSB No. 37094
                                         Office of the Attorney General
                                         900 East Main Street
                                         Richmond, Virginia 23219
                                         (804) 786-3344 – Telephone
                                         (804) 786-9907 - Facsimile
                                         email: JLief@oag.state.va.us
                                         *Counsel for Defendants*

Kenneth T. Cuccinelli, II
Attorney General of Virginia

Joshua N. Lief
Senior Assistant Attorney General

Peter R. Messitt
Senior Assistant Attorney General

Elizabeth B. Myers
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October, 2013, I electronically filed the foregoing and accompanying declarations with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/Joshua N. Lief
Joshua N. Lief